Filed 7/21/22  Darling v. Contreras CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROSLYN ANDERSON DARLING,<br><br>        Petitioner and Appellant,<br><br>        v.<br><br>CASSANDRA CONTRERAS,<br><br>        Respondent. | B311889<br><br>(Los Angeles County Super. Ct. No. 21STRO00667) |
| CASSANDRA CONTRERAS,<br><br>        Petitioner and Respondent,<br><br>        v.<br><br>ROSLYN ANDERSON DARLING,<br><br>        Appellant. | B312422<br><br>(Los Angeles County Super. Ct. No. 21STRO00646) |

APPEAL from an order of the Superior Court of Los Angeles County, David W. Swift, Judge. Affirmed.

Roslyn Anderson Darling, in pro. per., for Petitioner and Appellant.

Cassandra Contreras, in pro. per., for Petitioner and Respondent.

_____

Roslyn Anderson Darling (Darling) appeals from a civil harassment restraining order protecting her neighbor, Cassandra Contreras, and Contreras's family. Darling also appeals the denial of her request for a civil harassment restraining order protecting her and her partner from Contreras. The trial court granted Contreras's request for a restraining order based on a physical altercation between Contreras and Darling and Darling's subsequent racist threats against Contreras and her family.

On appeal, Darling contends her conduct did not rise to the level of civil harassment contemplated by Code of Civil Procedure section 527.6,[1] noting she was the one who suffered a black eye and facial lacerations during the altercation, whereas Contreras was uninjured. Further, according to Darling it was Contreras who assaulted Darling with force that was beyond what was necessary for self-defense. Darling also asserts the trial court abused its discretion in refusing to allow her to submit exhibits or continue questioning a witness. We affirm.

_____

[1] Further undesignated statutory references are to the Code of Civil Procedure.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Contreras's Request for a Restraining Order (B312422)*

On February 8, 2021 Contreras filed a request for restraining order against Darling prohibiting Darling from contacting or harassing Contreras, her husband, her five children, or her parents.[2]  In her request, Contreras stated that on February 7 Darling physically assaulted Contreras and "attempted to hit, push and shove [her] children."  Further, Darling struck Contreras and her eight-year-old son Peter with Darling's car and exposed Darling's children to "extreme verbal abuse, racial slurs, and criminal threats."  Darling's conduct caused Contreras leg pain and her son bruising and pain on his hip and right leg.  Contreras stated that on other occasions Darling made "[c]ontinuous verbal criminal threats and racial slurs."

On February 8, 2021 the trial court issued a TRO prohibiting Darling from harassing or contacting Contreras and her children and ordering Darling to stay at least 100 yards away from Contreras, her children, her children's school, Contreras's workplace, her vehicle, and her home.

B.    *Darling's Request for a Restraining Order (B311889)*

On February 9, 2021 Darling filed a request for a restraining order prohibiting Contreras from harassing or contacting Darling and her 80-year-old partner (described as her

---

[2]    On our own motion, we augment the record to include Contreras's request for civil harassment restraining order filed in the superior court on February 8, 2021.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

common-law husband) Dan Ziferstein. In her request, Darling asserted that the prior day[3] Contreras "severely battered [Darling] by charging to [Darling]'s house and beating up [Darling]." Darling asserted Contreras's conduct harmed her by causing heavy bleeding, bruising, and a black eye that required stitches. Darling included a photograph of herself with a black eye. On prior occasions, Contreras "repeatly [sic] went to [Darling's] yard and has refused to stay away after [she] was told to stay away."

On February 9, 2021 the trial court issued a temporary restraining order (TRO) prohibiting Contreras from harassing or contacting Darling and Ziferstein, and ordering Contreras to stay at least 10 yards away from Darling, Ziferstein, their home, and Darling's vehicle.

C.    *The Hearing on Darling's and Contreras's Petitions*

At the March 25, 2021 hearing, Darling and Contreras represented themselves and testified about the events of February 7, 2021. Darling and Contreras are neighbors, with one house between them. Contreras testified she lives with her husband, children, and elderly parents in her childhood home. According to Contreras, Darling is "a nuisance to the block" as "a repeat caller to 911." Further, Darling is "constantly calling the cops on [Ziferstein], having him arrested, [and] making false reports." Contreras "feels like [Darling] has a personal vendetta against [her]" because Contreras is friends with Ziferstein.

---

[3]    The parties testified at the hearing on the requests for restraining orders that the events in fact occurred on February 7, 2021.

4

Tensions came to a boiling point on February 7, 2021, when Ziferstein went to Contreras's home to ask her to move her car from the front of Darling's home. Darling testified that she had scheduled a delivery pickup for her refrigerator, and she wanted to make room for the truck. Contreras's car was difficult to move because its power steering was broken, but Contreras told Ziferstein, "Okay. When they get here, I will try to move [the car] forward, even if I have to park it in the middle of the street."

Darling testified Contreras told Ziferstein that Contreras did not want to move her car because she was having a party. Darling therefore decided to back her own car out of her driveway into the empty space in front of Contreras's house.

Contreras claimed Darling intentionally backed her car up toward Contreras while Contreras was standing in front of her house with her son Peter. According to Contreras, minutes after her conversation with Ziferstein, Darling "back[ed] up her vehicle up the street maliciously—intentionally," and the car "tap[ped]" Contreras and her son. Further, Ziferstein began "hitting" Darling's car window and yelling at her to stop. Contreras called 911 and reported the assault.

Darling and Ziferstein disputed that anyone was behind Darling's car while she was backing up. They both testified that only after Darling stopped her car did Contreras and a group of people gather behind the car.

Contreras testified that Darling parked her car and then went into her house, and within minutes Darling "comes out, places something on my vehicle, so I walk over there to see what it is. As I'm walking, [Darling] meets me at the sidewalk, and she's yelling in my face. I ask her to get out of my personal space. She then says she hits people. She doesn't mind going to jail. This is all on video. And then she strikes me. She pushes

me, and I do hit back." When the court inquired, "[H]ow long did the physical confrontation take?" Contreras responded, "[T]hirty seconds."

At some point, Contreras began recording the confrontation on her cell phone. Contreras's daughter Alyssa also witnessed and recorded the fight. Contreras testified that Darling pushed Contreras and tried to knock the cell phone out of Contreras's hand, and Contreras hit back.

Darling testified the confrontation occurred "an hour and a half"[4] after the car-parking incident, after Darling walked over to Contreras's car and lifted up the windshield wiper to leave a note. One of Contreras's children alerted Contreras that Darling had "done something to the car." Contreras came up yelling, "'Don't you dare put that note on the car.'" Darling added, "[I]t scared me. I like froze for a minute. And then I thought, 'Well, there's no reason not to leave this note.' So, I left the note, and I started walking back."

Darling denied she was the initial aggressor. She testified that "as [Contreras] was closely approaching me . . . I said to her—I said, 'Why did you come down for a traffic accident when the neighbor service truck came out when you had nothing to do with it? Why?' And when I asked that question, she clobbered me. [¶] . . . [¶] She swung, like, a very, very hard punch, and I went into a lot of pain and shock."

---

[4]     After reviewing the video time stamps, the trial court observed as to the timing of the physical altercation, "There's, obviously, a dispute about when, but it appears it's about 14 minutes later."

After viewing Contreras's video of the altercation,[5] the trial court stated, "I did see Ms. Darling being beyond belligerent and referring to Ms. Contreras as a low-life Mexican. You know, other various—various other insults. I did see Ms. Contreras push, but not strike, Ms. Darling, and Ms. Contreras says that push was after she had been hit by Ms. Darling, and I did see Ms. Darling appear to be—I guess other than one push by Ms. Contreras, it did appear that Ms. Darling, I believe, was the aggressor."[6] The court added, "I will note, for the record, that Ms. Darling was not wearing a mask and was, I would say, viciously yelling and spewing at Ms. Contreras."[7]

The trial court continued, "I have evidence in front of me of a single interaction, and . . . the evidence does suggest that Ms. Darling was the aggressor." But the court noted, "We generally don't give restraining orders for a single incident, and so if you think you need a restraining order, I need a little bit more from you as to a course of conduct or credible threats of violence or something more."

During the hearing Contreras provided numerous examples of other instances of harassment. She testified that Darling

---

[5]     Although the trial court admitted the video of the confrontation into evidence, it is not in the record on appeal. On May 25, 2022 we requested Contreras provide the video to the court, but we have received no response.

[6]     It is unclear from the trial court's description how Darling received the black eye, but it appears to be from the "push" by Contreras in response to Darling hitting Contreras.

[7]     The physical altercation took place during the COVID-19 pandemic. Contreras testified that Ziferstein came to her house on February 9, 2021, two days after the incident, to inform her that Darling had tested positive for COVID-19.

7

threatened "that she knows people and can make [Contreras] disappear" and "she knows where [Contreras] works." Alyssa testified that "[Darling] has been saying that she would, basically, get rid of us because we're Mexicans" as recently as two weeks before the hearing. Contreras added as to an incident at the grocery store on February 14, 2021 (while the TRO was in place) that Darling "made comments to me when she saw us [¶] . . . [¶] She's just violent. She'll make comments that she's going to poison the dog, or she'll try and get the mail lady." When the court asked Contreras to state the specific threats Darling made, Contreras replied that the prior week Darling stated as to Contreras's two dogs, "'I ought to throw something over and poison them.'" Alyssa also testified she overheard the threat to poison the dogs.

Contreras added that she had to install cameras on her property because she felt unsafe, explaining, "I feel like I need video evidence at all times because she's such a master manipulator and always files false claims." Contreras cited examples of Darling's false allegations, including that Contreras slashed Darling's tires and Contreras violated the TRO by calling Ziferstein. Contreras also described a February 21, 2021 incident in which Darling "had [Contreras's] house surrounded by helicopters and cops." According to Contreras, "[Darling] called [the police] and said that somebody had attempted to steal her car and ran into [Contreras's] house." Contreras testified she had video evidence showing she never went to Darling's property. In addition, Contreras's family disposed of their car to avoid future confrontations because Darling had called parking enforcement.

The trial court asked Ziferstein whether he thought Contreras and Darling were likely to have future confrontations.

Ziferstein responded, "No, I don't."[8]  The court excused Ziferstein, at which point Darling stated she had more questions for him regarding the parking incident, including whether anyone was behind her.  The court stated, "I'm not so concerned about the car incident. . . .  I'm not convinced that you tried to run someone over."  The court did not allow Darling to question Ziferstein further.

Darling offered as evidence a report from the Los Angeles Fire Department, marked for identification as Exhibit 1.  Darling represented the report stated she was injured after she "'was assaulted.'"

The court responded, "You're proving points that don't need to be proven.  I've seen a picture of you—I saw a video.  You had blood on your face, so I understand. . . .  A single altercation—a fight, no matter what happened, can be a criminal act, it can be a civil lawsuit.  And what I'm concerned about is preventing future violence where I need to restrain future conduct."

Darling suggested she had other evidence of Contreras's harassment of her, including police camera footage.  In response to the trial court's suggestion Darling show it to the court, Darling replied, "If we want to continue, I can subpoena that."  The court responded, "We're not continuing this.  We've given this matter a lot of time."  Darling then described a prior incident in which the police were called because Ziferstein had assaulted Darling.  Darling was talking to the police when Contreras showed up in Darling's yard with one of Contreras's children.

---

[8]    Although Ziferstein stated he did not expect there would be a future confrontation, he did not witness the physical altercation between Contreras and Darling.

Darling testified Contreras would not leave and instead "came up in my face and was swinging her hand in my face in a very frightening way.  And she kept saying, 'You want to know where I work?'"

Darling then testified she had been delivering free food to the Contreras household, but Darling learned the Contreras family was giving it to the neighbors.  The trial court interrupted, stating, "We're getting off track.  Look, I have a number of other matters.  I've already given you guys way more time than I usually do."  However, the court allowed Darling to continue with her testimony.  After additional testimony, Darling stated she "forgot to ask important questions" of Ziferstein, including "about [Contreras's] phone call to the house, while [Contreras] was under an order from the court."  The court responded, "I don't think I need it  [¶] . . . [¶]  I've heard enough."

The trial court denied Darling's request for a restraining order, explaining, after "consider[ing] all the evidence, the demeanor, and credibility of the witnesses . . . I do not believe that [Darling] has proven by clear and convincing evidence that [Contreras] engaged in harassment within the meaning of CCP, Section 527.6."  The court added, "In particular, there is evidence of an injury, but I think the evidence suggests that Ms. Darling was the aggressor, and that Ms. Contreras's actions were in self-defense."

The trial court granted Contreras's request for a restraining order, finding "based on the evidence and testimony presented, based on my determination of the credibility of the witnesses, that [Contreras] has proven by clear and convincing evidence that [Darling] engaged in unlawful harassment within the meaning of CCP, section 527.6 and that such conduct is likely to continue, unless a restraining order is issued."  The court

10

continued, "In particular, I find Ms. Contreras to be considerably more credible than Ms. Darling." The court based its findings "on the video evidence I've seen and based on [the] testimony of the witnesses." The court stated to Darling, "I do believe the evidence suggests that you have made credible threats of violence and that you have engaged in a course of conduct to harass your neighbors."

Darling interrupted the trial court multiple times, then stated, "I would like to submit the rest of my exhibits." The court responded, "We don't keep the exhibits, but . . . you can keep your exhibits, and you can include them in your appeal." Darling replied, "No. I'd like to submit them in this hearing." The court responded, "You can submit anything you want, but we have given this matter over an hour of testimony." The court continued, "You can hand them to the bailiff." The bailiff told Darling, "I'll take whatever you have." However, Darling did not submit the exhibits to the bailiff, instead stating, "I'd like to save these for my hearing."

When the trial court tried to read the restraining order advisements, Darling repeatedly interrupted, and asked the court if it was going to let her "finish [her] hearing." The court continued to attempt to read the advisements, but as the court noted for the record, "Ms. Darling has stormed out and has come back." Upon her return, Darling made various racist comments toward the court, including "You failed me as a white person. What are you, Oriental?" and "Our country is invaded. We're invaded."

The court issued a civil harassment restraining order protecting Contreras and her family and preventing Darling from coming within 50 yards of Contreras. The court added, "Given the outburst at the end, and . . . what I consider pretty clear

racial animosity exhibited by [Darling], let's issue the order for five years.  It's the maximum that I can give you."

Darling timely appealed.

## DISCUSSION

A.  *Governing Law and Standard of Review*

Under section 527.6, subdivision (a)(1), "[a] person who has suffered harassment . . . may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section."  Harassment is defined as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose."  (§ 527.6, subd. (b)(3).)

"'Unlawful violence'" is "any assault or battery, or stalking as prohibited in Section 646.9 of the Penal Code, but does not include lawful acts of self-defense or defense of others."  (§ 527.6, subd. (b)(7).)  An "assault" is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (Pen. Code, § 240.)  A "battery" is "any willful and unlawful use of force or violence upon the person of another." (Pen. Code, § 242.)  A "'[c]redible threat of violence'" is a "knowing and willful statement or course of conduct that would place a reasonable person in fear for the person's safety or the safety of the person's immediate family, and that serves no legitimate purpose.  (§ 527.6, subd. (b)(2).)

A "'[c]ourse of conduct" is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an

12

individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email." (§ 527.6, subd. (b)(1).)

"'Section 527.6 was enacted "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution." [Citations.] It does so by providing expedited injunctive relief to victims of harassment.'" (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1227, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*); accord, *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) "If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (§ 527.6, subd. (i).) After finding harassment, upon a showing of good cause, the court may include named family or household members in the restraining order. (§ 527.6, subd. (c).)

"The statute does not require the court to make a specific finding on the record that harassment exists, nor does it require specific findings of the statutory elements of harassment as defined in subdivision (b)." (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1112, disapproved on other grounds in *O.B., supra*, 9 Cal.5th at pp. 1003, fn. 4, 1010, fn. 7; accord, *Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 92.) Rather, the granting of the injunction implies the trial court found there was conduct constituting harassment under section 527.6. (*Ensworth,* at p. 1112 [upholding issuance of injunction under § 527.6 based on implied finding appellant engaged in harassing course of conduct that caused substantial emotional distress where appellant followed her prior psychologist, surveilled her house,

13

called her repeatedly, and sent her threatening letters after the psychologist terminated treatment].)

"[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*O.B., supra*, 9 Cal.5th at p. 1005.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012; accord, *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 499 (*Harris*) ["'We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value.'"].)

"'But whether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6'" is a question of law reviewed de novo. (*Harris, supra*, 248 Cal.App.4th at p. 497; accord, *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.)

14

B.     *Substantial Evidence Supports the Trial Court's Order*
       *Granting a Restraining Order Against Darling*

Darling contends it was Contreras who was the aggressor during the February 7, 2021 incident, not Darling, and Contreras fabricated the other instances of allegedly harassing conduct. But after hearing the testimony and watching the video evidence, the trial court found Contreras "to be considerably more credible than Ms. Darling." We defer to this credibility finding by the trial court. (*O.B., supra*, 9 Cal.5th at p. 1011; *Harris, supra*, 248 Cal.App.4th at p. 498.)

Contreras testified that in her February 7, 2021 confrontation with Darling after the parking incident, Darling yelled at Contreras, threatened that she "hits people," and pushed Contreras. As the transcript reflects, Darling yelled, "You know I beat people's ass. I've gone to jail for it, bitch." Contreras admitted she hit Darling back (presumably giving her a black eye). Although Darling testified it was Contreras who struck her first, the trial court found Contreras's account more credible. Moreover, the court described the video in which Contreras was "belligerent" and called Contreras a "low-life Mexican" and other insulting names. Based on this video, the court concluded that Darling "was the aggressor."

In addition, Contreres presented evidence of multiple other incidents of harassment. Contreras testified Darling violated the TRO by threatening "that she knows people and can make [Contreras] disappear," and "she knows where [Contreras] work[s]." Alyssa testified that as recently as two weeks before the hearing Darling said she would "get rid of us because we're Mexicans." Contreras and Alyssa also testified Darling threatened to throw poison onto the Contreras' property to harm her dogs, which constitutes conduct directed at Contreras that

15

would seriously alarm or annoy Contreras within the meaning of section 527.6, subdivision (b)(3).

Further, Contreras testified that Darling repeatedly called 911 with false claims, including that Contreras had slashed Darling's tires. And on February 21, 2021 Darling "had [Contreras's] house surrounded by helicopters and cops" after Darling told the police someone had tried to steal her car and then ran into Contreras's house. Substantial evidence therefore supports the trial court's implied finding of clear and convincing evidence of harassment based on Darling's physical violence, threats, racist insults, and false claims.

C. *The Trial Court Did Not Err in Denying Darling's Request for a Restraining Order*

Darling contends Contreras engaged in unlawful violence against Darling on February 7 that supported issuance of a restraining order against Contreras under section 527.6, subdivision (b)(3), highlighting that she suffered greater injuries than Contreras (the black eye). However, substantial evidence supports the trial court's finding Darling was the aggressor and Contreras's use of force against Darling was in self-defense. Further, Darling failed to present evidence of the likelihood of future violence.

"Under California law, a person may use reasonable force to resist a battery even if such force causes bodily injury to the initial aggressor." (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780 [family court did not abuse discretion in denying domestic violence restraining order where husband inflicted bruising and other injuries on wife in response to wife's attempts to take property by physical force, and husband did not use excessive force]; accord, *J.J. v. M.F.* (2014) 223 Cal.App.4th 968,

16

976 [family court abused discretion in issuing restraining order against mother who was not primarily the aggressor and acted in self-defense in defending against father]; see Civ. Code, § 50 ["[a]ny necessary force may be used to protect from wrongful injury the person or property of oneself, or of a spouse, child, parent, or other relative, or member of one's family . . . ."].) However, "[t]he right to use force against another has long been limited by the condition that the force be no more than "'that which reasonably appears necessary, in view of all the circumstances of the case, to prevent the impending injury.'"" (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 730, disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19; accord, *In re Marriage of G.*, at p. 780; *J.J. v. M.F.*, at p. 976 ["[T]he defendant is not liable if that defendant reasonably believed, in view of all the circumstances of the case, that the plaintiff was going to harm him or her and the defendant used only the amount of force reasonably necessary to protect himself or herself."].)

As discussed, the trial court found based on its review of the video that Darling was the initial aggressor and was being "belligerent" during the confrontation and "viciously yelling and spewing at Ms. Contreras." Contreras testified Darling was in her "personal space," was "yelling in [her] face," and threatened her just before Darling struck her, saying "she hits people" and "doesn't mind going to jail." According to Contreras, Darling had previously threatened Contreras, including that she knew people who could make Contreras "disappear," and she knew where Contreras worked. And Alyssa testified that two weeks before the confrontation Darling said she would get rid of the Contreras family because they were "Mexicans." Contreras added that Darling threatened to poison Contreras's dogs.

17

Although Darling testified that Contreras "clobbered" her and swung very hard, the trial court did not find Darling's testimony credible. As described by the court after watching the video, the court observed "Contreras push, but not strike" Darling. Certainly, Contreras pushed Darling sufficiently hard to cause Darling to sustain a black eye. But we cannot tell in the absence of the video how hard Contreras pushed Darling, or whether Darling was particularly sensitive to the push.

Based on the circumstances of the confrontation, including Darling's prior threats and threat just before Darling hit Contreras, substantial evidence supports the trial court's findings that Contreras pushed Darling in self-defense, impliedly finding Contreras used only the amount of force she reasonably believed was necessary to protect herself. Further, even if Contreras had not acted in self-defense (using more force than reasonably necessary), issuance of a permanent restraining order is only proper when "it appears that harassment is likely to recur in the future." (*Harris, supra*, 248 Cal.App.4th at p. 496; accord, *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402 ["An injunction is authorized only when it appears that wrongful acts are likely to recur."]; see *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332 [for issuance of prohibitory injunction, "it must appear with reasonable certainty that the wrongful acts will be continued or repeated"].) "'[T]he determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.'" (*Harris*, at pp. 499-500.)

18

Although Darling claimed she had evidence of prior instances of Contreras's harassment of her, she did not present the evidence to the court (asserting she needed to subpoena video evidence from the police department). Darling argues in her brief that Contreras has a criminal record of being a "batterer," and Darling includes documents in her opening brief that she asserts reflect arrests of Contreras by the Los Angeles County Sheriff's Department. However, these documents were not submitted at the hearing, nor are they authenticated records that show convictions for battery. Thus, although Contreras and Darling will continue to be neighbors, given the evidence that Contreras only pushed Darling in response to Darling's aggression against her, the circumstances do not support a finding that Contreras would commit violence or otherwise harass Darling in the future.

D.    *Darling Was Not Denied Due Process*

Darling contends she was deprived due process because the trial court refused to admit her exhibits at the hearing and to allow her to continue questioning Ziferstein. "'[A]lthough the procedures set forth in the harassment statute are expedited, they contain certain important due process safeguards. Most notably, a person charged with harassment is given a full opportunity to present his or her case, with the judge *required* to receive relevant testimony and to find the existence of harassment by "clear and convincing" proof . . . .'" (*Nora v. Kaddo* (2004) 116 Cal.App.4th 1026, 1028; accord, *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 730.) "'To limit a defendant's right to present evidence and cross-examine . . . run[s] the real risk of denying such a defendant's due process rights . . . .'" (*Nora*, at p. 1029; accord, *Schraer*, at p. 733.) "'We review a trial court's decision to admit or exclude

evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.""" (*People v. Young* (2019) 7 Cal.5th 905, 931; accord, *Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 584 ["We review the trial court's evidentiary rulings for an abuse of discretion."].)

The trial court allowed both parties and their witnesses to testify. It is true the court precluded Darling from questioning Ziferstein further regarding the parking incident, including how fast Darling was driving when she backed her car out of her driveway. But the court made clear it was not considering whether Darling battered Contreras's son with her car in ruling on the competing petitions, and thus this was not "relevant testimony." (*Nora v. Kaddo, supra*, 116 Cal.App.4th at p. 1028.) As the court explained, "I'm not so concerned about the car incident. [¶] . . . [¶] I'm not convinced that you tried to run someone over." Further, Darling was given an opportunity to submit all her exhibits to the court. The court twice informed Darling that she could hand her exhibits to the bailiff, but Darling refused, saying she would "like to save these for my hearing." Under these circumstances, Darling was not denied due process.

## DISPOSITION

The order granting Contreras's request for a civil harassment restraining order against Darling and the order denying Darling's request for a civil harassment restraining order against Contreras are affirmed. The parties are to bear their own costs on appeal.


                    FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.