Filed 1/9/14  Certified for publication 2/5/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| J.J.,<br><br>       Plaintiff and Appellant,<br><br>       v.<br><br>M.F.,<br><br>       Defendant and Respondent. | B246401<br><br>(Los Angeles County<br>Super. Ct. No. BF 040618) |

APPEAL from an order of the Superior Court of Los Angeles County, James D. Endman, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part; reversed in part.

Legal Aid Foundation of Los Angeles, Ana M. Storey, Ji-Lan Zang; and Amanda M. Jancu for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

The trial court issued a three-year mutual restraining order against both J.J. and M.F., pursuant to the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq.)[1] J.J. appeals. We reverse that portion of the mutual restraining order against J.J. but otherwise affirm.

## FACTS AND PROCEDURE

### 1. Initial Restraining Order

J.J. first applied for a domestic violence restraining order against M.F. in September 2011. J.J. sought protection for herself and the parties' son, who was then two years old. In support of her application, she explained the following. She and M.F. started dating in December 2007 and began cohabitating in April 2009. M.F. was first physically violent with her when she was about seven months pregnant. They argued over something insignificant, and he pushed her to the ground. She was able to break her fall with her hand and avoid landing on her stomach. On another occasion, after their son was born, she told M.F. she was going to stay with her mother for a week to get help with taking care of the baby. M.F. became angry and pushed her out of the car, leaving her alone in Compton. He choked her many times during their relationship and initiated many arguments with her in front of their son. She moved out of their shared home in June 2010 when he slapped and kicked her and threw her against a glass door. The glass door cracked, and she had a cut on her back, scratches on her chest, and marks on her throat from where he choked her.

Around September 2011, M.F. repeatedly came to J.J.'s apartment and demanded that she hand over their son. He also sent his friends to her apartment looking for her. M.F. told her he was going to get joint custody of their son so he would not have to pay child support. Beginning around August 3, 2011, he sent threatening text messages to her, saying, among other things: "When I see you I'm going to f--- you up"; "You're a stupid b----, you're going to suffer"; "I'm going to get my way one way or the other. I'm

---

[1]    Further undesignated statutory references are to the Family Code.

2

going to f--- you up"; and "I'm going to hurt your money income. Joint custody means no child support and welfare." He had been sending her messages of this nature up to the night before she applied for the restraining order. Approximately two days before she filed her application, she and her son moved to a confidential location. The court entered a temporary restraining order (TRO), and after a hearing, the court issued the requested three-year restraining order on September 28, 2011.

## 2. *Motion to Set Aside Restraining Order and Attempt to Vacate Set Aside Order*

In January 2012, M.F. filed a motion to set aside the restraining order on the ground he did not have notice and an opportunity to respond to J.J.'s application. He also asserted he had never caused or threatened harm to J.J. J.J. did not appear at the hearing on the motion to set aside, when the court granted the motion.

In September 2012, J.J. applied ex parte to vacate the order setting aside the restraining order. She stated she had never received notice of the motion to set aside and did not discover her restraining order was ineffective until September 2012. She also explained she did not give M.F. notice of her application for a restraining order until after the court had entered the TRO. Once the court did, however, she personally served him with the TRO, her application, and notice of the hearing. On the other hand, the address he listed for her on his proof of service for the motion to set aside was not her address -- it was the address for the superior court on Commonwealth Avenue. Hence, she never received notice of the motion. She only discovered the court had set aside her restraining order because M.F. went to J.J.'s mother's house while J.J. was at work and tried to take their son from the house, and her cousin, who was babysitting their son, called the police. When she told the police M.F. was violating a restraining order by trying to take their son, the police checked their system and told her there was no restraining order. Given that M.F. had shown up at her mother's house and tried to take their son, she said she was "even more terrified" of what he would do. He had not shown any interest in visiting their son when her mother tried to arrange visitation, and she believed the attempt to take their son was meant to frighten and harass her.

3

The court did not grant J.J. ex parte relief but set the matter for hearing in October 2012.

### 3. *Application for Second Restraining Order and Court's Entry of Mutual Restraining Order*

**a. J.J.'s Evidence**

In the meantime, J.J. filed a second ex parte application for a restraining order, with notice to M.F., because of a recent incident that occurred on October 7, 2012. On that date, M.F. brought their son to J.J.'s grandparents' house after a visit. Their visitation exchanges occurred at her grandparents' or her mother's house because she has kept her address confidential. M.F. forgot to bring their son's only warm jacket back when he dropped off the boy. At the time, it was cold and she needed the jacket for their son at night and when she took him to daycare in the mornings. Their son was also sick with a cold. Her grandmother called M.F. and asked him to bring the jacket. M.F. said he would bring it the next day, and when her grandmother explained why she needed the jacket that night, M.F. hung up the phone on her. J.J. then called M.F.'s mother, who said she would "take care of it" when J.J. explained why she needed the jacket that night. A few minutes later, M.F. called and told her if their son needed a jacket, she should go get one, and he hung up on her. J.J. called M.F.'s mother again, but she told J.J. to stop calling, even when J.J. offered to come pick up the jacket herself.

J.J. decided to leave her grandmother's at approximately 9:30 p.m., after going back and forth with M.F. and his mother. As she was walking to her car with their son, M.F. approached her with the jacket. She took the jacket and tried to get into her car, but M.F. had parked behind her and blocked her from leaving. He approached her and yelled, "I want my son! Give me my son!" He started to try to take their son from her arms and began yelling at her. Their son looked confused and started crying, and she pushed M.F. and screamed at him to get away from her. M.F. grabbed her by the neck while his wife jumped out of their car and punched J.J. in the face. His wife also took off her shoe and hit J.J. in the face with it, and M.F. continued choking her. J.J.'s grandparents and their neighbors eventually intervened and forced M.F. and his wife to

4

leave.  J.J. called the police, who took J.J.'s statement and also took M.F.'s wife's shoe, which she had left behind.  A declaration from J.J.'s grandmother was consistent with J.J.'s account of what happened on October 7, 2012.

After explaining this October 2012 incident, J.J. recounted the same prior incidents of violence she had used in support of her September 2011 application for a restraining order.  Further, J.J. explained she had always been their son's primary caretaker, and he had always lived with her.  In December 2010, the court had granted her sole legal and physical custody with alternating weekend visits for M.F.  J.J. said M.F. rarely exercised his right to visit their son; he visited with their son only five times in 2010 and approximately every three months in 2011.  When their son was present during the latest incident, she said he seemed terrified.  He was crying, screaming, and jumping up and down as he saw M.F. and his wife hit and strangle J.J.  He had been reenacting the incident since then with his stuffed animals and telling people that "his daddy hit his mommy."  J.J. expressed her concern about how the incident was affecting their son because it seemed to remain fresh in his mind, whereas with prior incidents, he was much younger and she did not think he was fully aware of what was occurring.  For these reasons, she was asking the court to order supervised visits in a public place.  Her mother was willing to supervise the visits.  She also asked the court to order that all visitation be arranged through her mother or other family members so that she was not involved in the visits or exchanges.

**b.  M.F.'s Evidence**

On November 6, 2012, M.F. filed a response to J.J.'s application and served her with it.  In his supporting declaration, he explained that J.J. called him and his mother and was "cursing and yelling" at them about the jacket, so he finally decided to take it to J.J. that night, even though he had already told her he would take it the next morning.  He said his mother had over 20 missed calls on her cell phone from J.J. because his mother refused to answer her calls after J.J. yelled at them.  He denied having any physical contact with J.J. on October 7 and said J.J. instead attacked his wife, and he only served as a physical barrier between the two women at one or two points.  He tried to give his

5

son a kiss goodbye, but J.J. yelled at him and snatched their son away from him. It was after this that J.J. went to his car and attacked his wife. J.J.'s grandparents had to pull her away from his wife. He thought J.J. and her grandmother were lying because they wanted to keep him away from his son, and J.J. had been withholding their son from him ever since he married in May 2011. M.F.'s wife also filed a declaration stating J.J. had attacked her on October 7. M.F.'s response to the application for a restraining order did not request a restraining order against J.J.

c.  **Hearing and Statement of Decision**

The court heard the matter on the same morning M.F. filed and served his response and the following morning. J.J., M.F., and J.J.'s grandmother testified consistent with their written declarations. The court characterized the October 7, 2012 incident as "mutual combat" or a "mutual altercation," and noted: "[S]o the court will indicate that according to [J.J.], she indicated she pushed [M.F.] as he was approaching her. She also, according to [M.F.], was harassing him telephonically over the jacket, making numerous phone calls regarding that in a harassing fashion." The court entered a mutual restraining order against the parties.

The court's statement of decision found M.F. had a history of abusing J.J., and specifically, during past incidents he had pushed J.J. out of a car, pushed her through a glass door, and sent her several threatening text messages. The court acknowledged the parties had different accounts of what occurred after M.F. returned the jacket and recounted the statements of the witnesses. The court found M.F. committed acts of violence against J.J. by choking and dragging her and he intentionally or recklessly caused or attempted to cause bodily injury to her. At the same time, the court explained: "With regards to the mutual restraining order, which was not requested by [M.F.] but was raised by the court, the court found that there was aggression on the part of both parties. [J.J.] harassed [M.F.] by calling him several times to have the child's jacket returned. [J.J.] also committed the first physical act, as she testified that she pushed [M.F.] away as he approached her and tried to snatch the child. The court found that both parties acted with aggression, which was interspersed with acts of defense, but that neither party

6

retreated. The court found that such use of defense without an attempt to retreat is not an excuse for domestic violence. Therefore, the court issued mutual restraining orders against both parties."

J.J. filed a timely notice of appeal.[2]

## DISCUSSION

J.J. contends the court erred in issuing a restraining order against her as part of the mutual restraining order. She argues the court abused its discretion because the statutory requirements for the issuance of a mutual restraining order were not met, and further, the court's sua sponte issuance of the order violated her due process rights. We agree substantial evidence did not support the issuance of the restraining order against her and reverse on that basis. We need not reach her remaining due process argument.

We review the court's issuance of a restraining order under the DVPA for abuse of discretion. (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264.) "However, '[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the "'legal principles governing the subject of [the] action . . . .'"'" (*Id.* at pp. 1264-1265.) We review the court's factual findings supporting the mutual restraining order for substantial evidence. (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822.)

Under the DVPA, a court may issue an order "with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit or, if necessary, an affidavit and any additional information . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300.) "California law regulates the issuance of *mutual* restraining orders under the DVPA by subjecting them to additional procedural requirements. (§ 6305.)" (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 200.)

---

[2]    M.F. has not filed a respondent's brief. California Rules of Court, rule 8.220, subdivision (a)(2), provides that in such circumstances, "the court may decide the appeal on the record, the opening brief, and any oral argument by the appellant."

Section 6305 provides: "The court may not issue a mutual order enjoining the parties from specific acts of abuse described in Section 6320 (a) unless both parties personally appear and each party presents written evidence of abuse or domestic violence and (b) the court makes detailed findings of fact indicating that *both parties acted primarily as aggressors and that neither party acted primarily in self-defense*." (Italics added.)

Here, the court's factual findings at the hearing and in its statement of decision indicate that J.J. was both acting primarily as an aggressor and not acting primarily in self-defense (§ 6305) because she pushed M.F. before he touched her and she was "harassing" him with phone calls about their son's jacket. Substantial evidence does not support these findings. According to M.F.'s evidence, J.J. never touched him. While J.J. said she pushed M.F. away from her when he came at her and their son, this was the only time she acted against him. The rest of the altercation involved, as the court found, M.F. choking and dragging her. The single act of pushing M.F. away does not support a finding that she acted *primarily* as an aggressor, especially in view of M.F.'s history of abuse against her. He had pushed her out of a car, pushed her through a glass door, and sent her threatening text messages saying he was going to "f---" her up, among other things -- acts on which the court had based its previous restraining order against M.F.

Under these circumstances, the evidence shows J.J. was acting primarily in self-defense and not primarily as an aggressor. Although the Family Code does not define self-defense, the Civil Code states that "[a]ny necessary force may be used to protect from wrongful injury the person or property of oneself, or of a . . . child." (Civ. Code, § 50.) In a suit for assault and battery, the defendant is not liable if that defendant reasonably believed, in view of all the circumstances of the case, that the plaintiff was going to harm him or her and the defendant used only the amount of force reasonably necessary to protect himself or herself. (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 600; CACI No. 1304.) In this case, M.F. had already returned their son's jacket to J.J. and had no reason to approach her other than to intimidate her. Emotions were already running high because of the dispute about the jacket. Given this dispute, his history of physical abuse, and his threats to harm her, she reasonably believed he might do her harm when he

8

came at her and yelled at her to hand over their son. The force she used to push him away was not excessive, as neither he nor she said he was harmed by the push. Substantial evidence did not support a finding that J.J. acted primarily as an aggressor and not in self-defense when she pushed M.F.

Nor did J.J.'s phone calls about the jacket support a finding that she was acting primarily as an aggressor. These calls were not the type of conduct that may be enjoined under the DVPA. In pertinent part, the DVPA provides the court may issue an order enjoining a party from "harassing, [and] telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code . . . ." (§ 6320, subd. (a); see § 6340, subd. (a).) Penal Code section 653m, subdivision (b), prohibits a person from making repeated telephone calls with intent to annoy or harass, but "[n]othing in this subdivision shall apply to telephone calls or electronic contacts made in good faith." The evidence here showed J.J. made the phone calls in good faith. She made repeated calls because her very young son was ill, the weather was cold when she took him to daycare in the morning, and the child had only the one warm jacket. As a mother concerned about her child's health, she had a legitimate and nonharassing reason to contact the father. Again, this was not acting out as an aggressor.

Although not dispositive, we note M.F. never once indicated that he felt threatened by J.J. or wanted a restraining order against her. He never claimed to have been abused or threatened by her.[3] In short, we cannot say the statutory requisites for a mutual restraining order -- that J.J. acted primarily as an aggressor and not in self-defense -- were met.

---

[3]     At most, M.F. claimed J.J. attacked his wife, but the mutual restraining order at issue protects only him and does not restrain J.J. from his wife.

9

## DISPOSITION

The portion of the mutual restraining order granting an injunction against J.J. is reversed.  In all other respects, the order is affirmed.  Appellant to recover costs on appeal.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.

10

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| J.J., | B246401 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BF 040618) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| M.F., | |
| Defendant and Respondent. | NO CHANGE IN JUDGMENT |

THE COURT:[*]

The opinion in the above-entitled matter filed on January 9, 2014, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

---

[*]     BIGELOW, P. J.           RUBIN, J.           FLIER, J.