Filed 11/1/22  Y.L. v. L.T. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Y.L.,<br><br>    Petitioner and Respondent,<br><br>    v.<br><br>L.T.,<br><br>    Respondent and Appellant. | H048453<br>(Santa Clara County<br> Super. Ct. No. 19FL000116) |

L.T. appeals from the denial of his request for a reciprocal restraining order against his wife, Y.L., asking us to hold that one who reacts with physical force to emotional abuse by an intimate partner must be restrained as a matter of law. We reject L.T.'s legal contentions as unsupported by the Domestic Violence Prevention Act (the Act). We likewise reject his alternative challenge to the sufficiency of evidence supporting the trial court's determination that Y.L. was not a primary aggressor. Accordingly, we affirm.

## I.    BACKGROUND

L.T. and Y.L. were married in 2010 and have two children—Z.T., born in 2014, and E.T., born in 2017. At the time of the relevant events, L.T. was a senior engineer for a technology company and Y.L. was running a startup producing a Singaporean food product.

**A.** *Y.L.'s Claims of Abuse by L.T.*[1]

Starting in 2016 or 2017, L.T. routinely monitored Y.L. through video and/or internet surveillance and a tracking device on her car. As tensions mounted during the marriage, L.T. further "engaged in an unrelenting verbal campaign" at all hours and in the presence of their children, in which he disparaged Y.L., her business, her parenting, and her preference to remain in California rather than relocate to Singapore.

The trial court found that L.T.'s disparagement of Y.L. in the presence of their children caused Y.L. sufficient emotional distress that, on Mother's Day 2018, after L.T. told Z.T. that "mama doesn't love you," Y.L. exited the still-moving family car as L.T. was driving it on the freeway. The trial court found that L.T.'s conduct in the presence of the children on another occasion in August 2018 drove Y.L. to call to police in distress: L.T. followed Y.L. from room to room and into her car while hectoring her about her unwillingness to move to Singapore, her business, and her adequacy as a mother and a woman, and ultimately prevented her from driving away.

The trial court further found that starting in December 2018—when L.T. first suspected Y.L. was having an affair with a coworker, S.C.—L.T. surreptitiously accessed Y.L.'s private text messages with S.C. and surveillance footage from the factory where they worked, then disclosed what he learned to both Y.L. and her father in "an attempt to shame, embarrass, and to coerce behavior by both [Y.L.] and [her father], consistent with [L.T.'s] interests." In December 2018, L.T. told Y.L. he had learned of her infidelity from a friend at Apple who had been able to access the unencrypted content from her iPhone: in the ensuing hours-long confrontation, during which he kept Y.L. locked in her car without access to her keys, L.T. eventually secured Y.L.'s agreement that he could take the children to Singapore for six months, in return for an amicable and discreet

---

[1] L.T. on appeal disputes neither the trial court's factual findings as to his abuse of Y.L. nor the necessity of a restraining order to prevent a recurrence of his abuse, though he maintains that his abuse of Y.L. is irrelevant to our review.

2

separation. L.T. later provided Y.L. with a flash drive loaded with copies of the text messages he had accessed as "an early Christmas present." After learning of the affair, L.T. also insisted on nightly "guilt sex" with Y.L., who described L.T.'s rationale in her testimony: "[I]t takes four weeks to -- at least four weeks to break a pattern and a habit. . . . He said that the heart follows the body and the body follows the mind -- the brain. And the only way to take control of me is through my body. . . so that I will learn to love him again. So that my body will – follow[] my brain."

L.T. told Y.L. that he continued to need the surveillance "so [his] imagination [didn't] get the better of [him,]" and instructed her, based on the video surveillance, to dress more modestly. But beyond conveying to Y.L. his awareness of all her activities, L.T. also repeatedly shared with Y.L.'s father, an investor in Y.L.'s business, his evidence of Y.L.'s relations with S.C. The trial court noted that L.T. even at trial "remain[ed] consumed with [Y.L.'s] relationship with [S.C.] and continue[d] to take advantage of opportunities to embarrass [Y.L.] by revealing details about it." The court likewise found it significant that L.T. in text exchanges never denied Y.L.'s allegations that he "blackmailed [her] with the kids" by causing her to fear his "raising [his] voice" to them and that he played on her shame over the affair to secure her submission to his demands for "guilt sex."

Later, L.T. violated a temporary restraining order for Y.L.'s protection by attempting to learn her new address.

## B. *L.T.'s Claims of Abuse by Y.L.*

L.T. contended that Y.L. committed acts of physical abuse against him in November 2018 and February 2019 then compounded this physical abuse by text messages in February 2019 which he interprets as death threats.

In November 2018, L.T. and Y.L. argued about moving to Singapore in their kitchen in front of their children. L.T. told Y.L. she did not do enough for the children and called her a "parasite." He refused Y.L.'s entreaties to stop fighting. Z.T. chimed in

3

that she would like to go to Singapore. Y.L. opined that Z.T., then four years old, should not be involved in the argument, but L.T. told Y.L. to let Z.T. speak her mind. Y.L. left the kitchen, but returned upon hearing Z.T. say, "Papa, Papa. You won[,] right? You won the conversation?" Y.L. told L.T. his behavior was "very wrong" and "very mean." Y.L. retreated to the master bedroom and wept, but L.T., ignoring her repeated requests to leave the room and stay away, nonetheless put his hands on her. Y.L. responded by grabbing L.T.'s forearm and pushing him away, leaving four crescent-shaped indentations and a slight scratch with her fingernails. L.T. took a picture of his forearm but told Y.L. the next day that he "liked that [she] was being feisty."

In February 2019, after petitioning for legal separation, Y.L. traveled to Singapore, where she had agreed L.T. could stay with the children for several months. During a cab ride, L.T. extolled the country's virtues to Z.T. L.T. told Z.T. that if she wanted to be "number one like Papa" she had "to go to this school in Singapore like Papa." At one point, L.T. and Z.T. discussed "the bad guy"—S.C.—from whom Z.T. was "safe" now that the family was in Singapore. L.T. ignored Y.L.'s non-verbal signals to break off the conversation.

Y.L. testified, "I recognized the pattern. . . . [L.T.] made our daughter start fearing California and start[] to think that there are a lot of bad people in California. . . . [¶] He would not stop. And I recognized -- . . . [Z.T.] looked up to her dad and everything he said was right, and . . . everything that he believed in. And I was desperate." The trial court credited Y.L.'s testimony that L.T. was again disturbing her peace.

When the cab stopped, Y.L. got out and told L.T. she needed to talk to him. When L.T. refused, Y.L. tried to pull him towards her, her hand behind his neck; he then either "jerked backward," in Y.L.'s telling, or "resist[ed]," in L.T.'s version. The trial court found that Y.L. was attempting to pull L.T. away from Z.T.

4

The contact left L.T. with three horizontal red scratch marks on his neck. Four days later, L.T. visited a doctor and filed a police report but did not attempt to press charges.

Later that month, Y.L. sent L.T. texts protesting his "drop[ping] hints here and there with [family members] against my wishes." Y.L. wrote: (1) "I can't stop you. . . . I am holding up my side and have not gone at you at your throat, but I do feel like coming at your throat, so don't push it"; (2) "I said I'm sorry for scratching your neck. And don't push me back against the wall, because I haven't come at your throat yet"; and (3) "Out of love and respect, you should then back off, because I have left you plenty of room[]. I wanted to be clear, [I] haven't come at your throat. And I told you I could have, but I haven't. Anyways, time out."

In the trial court, Y.L. characterized the messages as a warning that she was prepared to embarrass L.T. by exposing the way he stalked her, bullied her, and used guilt to induce her to have sex with him, whereas L.T. characterized the texts as a death threat. The trial court construed these messages as expressions of frustration with L.T. for disclosing her extramarital relationship contrary to their agreement and for "manipulating her."

**C.** *Procedural History*

On January 10, 2019, Y.L. filed a Petition for Legal Separation of Marriage. On April 16, 2019, L.T. filed a Response and Request for Dissolution of Marriage.

On May 2, 2019, L.T. filed a request for a DVRO against Y.L. The court issued a temporary restraining order the same day.

On May 16, 2019, Y.L. filed a request for a DVRO against L.T. Again, the court issued a temporary restraining order on the same day.

The court held a three-day bench trial regarding the cross-requests for DVRO's. After considering objections to its tentative statement of decision, the court filed its final statement of decision on June 25, 2020.

5

The court rejected L.T.'s claim that Y.L. engaged in acts of abuse and found as to the November 2018 incident that Y.L. had acted in self-defense when she grabbed L.T.'s arm. The trial court found that Y.L. was not a primary aggressor at any time. Accordingly, when the court entered an order restraining L.T., it denied L.T.'s request for a mutual order restraining Y.L.

L.T. timely appealed, contesting only the court's denial of his request for an order restraining Y.L.

## II.     DISCUSSION

L.T. on appeal challenges neither the trial court's issuance of a restraining order protecting Y.L. nor the findings of abuse on which the court predicated that order, but he contends that the trial court's findings required issuance of a reciprocal restraining order protecting him from Y.L. According to L.T., Y.L.'s resort to physical force in reaction to his nonphysical coercive control compelled both a finding that she, too,[2] was a primary aggressor not acting in self-defense, and issuance of an order of protection in his favor. Although we are unable endorse the totality of the trial court's reasoning, we discern no legal or evidentiary defect in the trial court's crucial determination that Y.L. was not a primary aggressor. Rather, it is L.T.'s effort to import bright-line rules purporting to mandate the issuance of restraining orders that contravenes the letter and purpose of the Act. We conclude that the court acted within its discretion in denying L.T.'s request for a reciprocal restraining order and that, on this record, any anomalies in its legal reasoning in other respects were harmless.

### A.     *Standard of Review*

We review an order granting or denying a restraining order for abuse of discretion. (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143 (*M.S.*); see also *In re Marriage of*

---

[2] In urging the need for mutual restraining orders, L.T. necessarily concedes that he was a primary aggressor at some point.

6

*Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424; *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495.)  Where the trial court's exercise of discretion turns on a disputed question of law, we apply our independent judgment to the trial court's resolution of that legal question.  (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116 (*F.M. & M.M.*).)

Where the trial court's exercise of discretion depends on factual findings, we review the record to determine only whether substantial evidence supports those findings, "not whether a contrary finding might have been made.  [Citation.]  We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the judgment."  (*M.S.*, *supra*, 76 Cal.App.5th at p. 1144.)  We adopt the trial court's credibility determinations.  (See *McCord v. Smith* (2020) 51 Cal.App.5th 358, 364.)

Even where error is apparent, "we will not substitute our opinion and divest the trial court of its discretionary power unless [appellant] shows a clear case of abuse and a miscarriage of justice."  (*In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 500; *In re S.G.* (2021) 71 Cal.App.5th 654, 673 (*S.G.*); cf. *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 261 [unless effect of error is "unmeasurable," Cal. Const., art. VI, § 13 & Code Civ. Proc., § 475 require inquiry regarding harmlessness], overruled on another ground in *Lamps Plus, Inc. v. Varela* (2019) __ U.S. __, 139 S.Ct. 1407, 1417-1419.)

**B.**     ***"May" vs. "Shall": a Trial Court's Discretion Under the Act***

L.T.'s complaint that he is entitled as a matter of law to a restraining order of his own depends on a misreading of the Act.  The Act is not a legal mandate compelling courts to issue injunctions as redress for past acts of abuse.  It is a grant of discretionary authority allowing courts to restrain individual liberty—subject to prescribed conditions and procedural limits—"to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a

7

period sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code, § 6220.)[3]

Under the Act, a court *may* issue a restraining order to prevent domestic abuse if the party seeking the order " 'shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.' " (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 367 (*Melissa G.*); § 6320.) "Abuse" includes not only criminal conduct such as actual or threatened physical violence but also "disturbing the peace of the other party" and acts of "coercive control." (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 977-978 (*K.L.*); §§ 6203, 6320.) Beyond the threshold requirement of a past act of abuse, however, a court in determining whether to issue a restraining order after notice and a hearing "shall consider whether failure to make any of these orders may jeopardize the safety of the petitioner and the children for whom the custody or visitation orders are sought." (§ 6340, subd. (a)(1).) In other words, although a finding of past abuse is a necessary precondition to the issuance of a restraining order, such a finding does not require the trial court to issue a restraining order upon request or prescribe minimum conditions for an order, if issued. Rather, the trial court in exercising its "broad discretion" to decide whether to issue a restraining order (*M.S.*, *supra*, 76 Cal.App.5th at p. 1143) must first determine whether a restraining order is necessary to prevent a recurrence of that past abuse, and if so, what scope of restraining order is necessary.

Moreover, where both parties have mutually engaged in abuse, the Legislature as a matter of public policy has prohibited the issuance of mutual restraining orders unless the trial court "makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense." (§ 6305, subd. (a)(2).) "[M]utual restraining orders are the exception," not the rule, and in making the required findings, "the court 'shall consider' . . . the *specific circumstances* of the history of

_____

[3] Undesignated statutory references are to the Family Code.

8

domestic violence in the case before it. [Citations.]" (*K.L.*, *supra*, 70 Cal.App.5th at p. 979, italics added.) But even where both parties acted as primary aggressors and not primarily in self-defense, nothing in the Act compels a court to issue mutual restraining orders: the touchstone remains whether both primary aggressors—or either of them—need to be restrained for the safety of the other and their children. (§§ 6220, 6340, subd. (a)(1).)

An order of protection, it should not be necessary to state, is not an instrument of redress, retaliation, or punishment for the restrained party's past misdeeds, even if the restrained party may experience it as such. The overarching legislative purpose is balancing the future interests of the parties in favor of protection against a recurrence of proven abuse.

## C.  *Primary Aggression and the Burden of Proof*

L.T. adopts a reductive misreading of the multifaceted inquiry into primary aggression under section 6305. He contends that Y.L. was the primary aggressor "as a matter of law" because it was Y.L. who first resorted to physical violence "in response to [L.T.'s] 'verbal harassment' and disturbing her peace." In conflating "primary aggressor," and "physical aggressor," L.T. again mistakes the statutory inquiry.

A court in determining whether both parties "acted primarily as aggressors . . . shall consider the provisions concerning dominant aggressors set forth in paragraph (3) of subdivision (c) of Section 836 of the Penal Code." (§ 6305, subd. (b).) Under the Penal Code, a "dominant aggressor is the person determined to be the most significant, rather than the first, aggressor[,]" based on " (A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense." (Pen. Code, § 836, subd.(c)(3).) The multifactor dominant aggressor inquiry does not prioritize any one of these factors over another, and it accordingly does not turn exclusively on which of the parties resorted to

9

physical violence or on a requirement that physical violence only have been used in self-defense.[4] Determining which of the parties is the " 'most significant' aggressor" requires the court to weigh the acts of the parties against each other: "in deciding whether mutual restraining orders should issue, the trial court must consider the parties' respective alleged acts of domestic violence in concert, and not separately." (*K.L.*, *supra*, 70 Cal.App.5th at p. 979; see also *In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 124 (*Everard*) [statutory requirement " ' "helps ensure that a mutual order is the product of the careful evaluation of a thorough record and is not simply . . . an expedient response to joint claims of abuse" ' "].) A court that instead "separat[es] out for analysis each party's claim of abuse against the other, and issu[es] restraining orders against both parties as if incidents occurring at different times must be wholly unrelated, . . . does not give full effect to the statutory directive that it 'shall consider' both 'the history of domestic violence between the persons involved' and 'protect[ing] victims of domestic violence from continuing abuse.' " (*Melissa G.*, *supra*, 27 Cal.App.5th at pp. 371-372.)

Notwithstanding this prohibition on decontextualizing each party's claim of abuse, it is precisely this trees-not-forest focus that L.T. urges us to undertake. Even though the

---

[4] The Legislature stopped short of equating a "primary aggressor" under section 6305 with a "dominant aggressor" under Penal Code section 836, subdivision (c). L.T. cites no authority for the proposition that the Legislature intended "primary aggressor" under section 6305 to be wholly coextensive and coterminous with "dominant aggressor" under Penal Code section 836, and we decline to presume such an equation. Unlike the Penal Code, the Act recognizes a wider range of conduct—including coercive control and emotional abuse—as civilly enjoinable. (See, e.g., §§ 6203, subd. (a)(4) and 6320; see also *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146 ["disturbing the peace" under the Act is not limited to Penal Code section 415].) Although L.T. asserts that Y.L. would have been arrested in February 2019, if both parties had been in violation of mutual restraining orders, we have no occasion to address his hypothetical. A trial court deciding whether to issue mutual restraining orders after an adversarial evidentiary proceeding is differently situated than an officer charged with determining in the field which of two potential suspects is subject to arrest, where probable cause exists to believe both have violated those mutual restraining orders.

trial court was obliged to weigh the conduct of the parties in the context of the relationship as a whole, L.T. asserts that his own abuse of Y.L. is irrelevant to our review. L.T.'s claimed entitlement—as a matter of law—to a primary aggressor determination represents an inversion of the nuanced, context-driven inquiry the Legislature intended and the courts have enforced. (See *K.L.*, *supra*, 70 Cal.App.5th at p. 979.)

The ultimate determination of whether a party acted as a primary aggressor is a mixed question of fact and law, not a pure question of law. To decide whether a party acted as a primary aggressor, the court must make findings of historical fact and consider the factors set forth in Penal Code section 836 subdivision (c) paragraph (3) in weighing the historical facts to make an ultimate determination. (See *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [" 'Questions of fact concern the establishment of historical or physical facts[.] . . . Questions of law relate to the selection of a rule[.] . . . Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied' "].) The primary aggressor determination " 'requires application of experience with human affairs,' " such that it is " 'predominantly factual and its determination is reviewed under the substantial-evidence test.' " (See *ibid*. [setting forth standard for determination of whether question is predominantly factual or legal]; *Everard*, *supra*, 47 Cal.App.5th at p. 126 [applying substantial evidence standard of review to trial court's determination that husband was a " 'primary aggressor' "].)

In suggesting that the trial court's factual findings permit us to deem Y.L. a primary aggressor as a matter of law, L.T. looks to *J.J. v. M.F.* (2014) 223 Cal.App.4th 968 (*J.J.*), *In re Marriage of G.* (2017) 11 Cal.App.5th 773 (*Marriage of G.*), and *Melissa G.* for support, but he mistakes their holdings. In *J.J.*, the Court of Appeal *reversed* the trial court's *grant* of mutual restraining orders because "the evidence show[ed] [that] J.J. was acting primarily in self-defense and not primarily as an aggressor." (*J.J.*, *supra*, 223 Cal.App.4th at p. 976.) In *Melissa G.*, the Court of Appeal likewise reversed mutual

11

restraining orders entered without the required findings and remanded the matter to the trial court to determine whether to enter mutual restraining orders or restrain only one party. (*Melissa G.*, *supra*, 27 Cal.App.5th at pp. 367, 373-375.) Neither of these cases, accordingly, support the proposition that a trial court may be required as a matter of law to issue mutual restraining orders, either on this record or in accordance with the bright-line rule L.T. posits—i.e., whoever resorts first to physical force. In *Marriage of G.*, the Court of Appeal merely affirmed the denial of a restraining order, finding no abuse of discretion despite the use of force resulting in bodily injury to the requesting party. (*Marriage of G.*, *supra*, 11 Cal.App.5th at pp. 780-781.) Consistent with their holdings, none of these cases rehabilitates L.T.'s fundamental legal error.[5]

**D.**    *The Trial Court's Consideration of Self-Defense and Primary Aggression*

Declining L.T.'s bright-line proposals for entitlement to a restraining order as a matter of law, we consider the trial court's determination that Y.L. was not a primary aggressor and discern no prejudicial error. It follows that the court properly denied L.T.'s request for a mutual DVRO.

Although we review for substantial evidence a determination that a party acted as a primary aggressor, "[t]he substantial evidence standard of review takes on a unique

---

[5] Alternatively, L.T. relies on *Bartosh v. Banning* (1967) 251 Cal.App.2d 378 for the proposition that Y.L. bore—and as a matter of law failed to carry—the burden of proving self-defense as an affirmative defense. Here again, L.T. fails to appreciate the different allocation of the burden of proof in a civil action for damages in tort as opposed to a proceeding for injunctive relief under the Act. In petitioning for the prospective relief of a domestic violence restraining order, L.T. bore the burden of proof and persuasion not only as to whether Y.L. had committed an act of abuse but also as to whether issuance of a restraining order was warranted under section 6340. (*S.G.*, *supra*, 71 Cal.App.5th at p. 671 [mother did not meet her burden on appeal of demonstrating record "compel[led] a finding" that failure to issue protective order would jeopardize her safety].) We can conceive of no circumstance in which a party seeking an order of protection would be able to meet the burden of establishing the need for the order without at least a minimal showing that the past act complained of was unjustified.

12

formulation where, as here, 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals.' [Citation.] '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.] Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*S.G., supra*, 71 Cal.App.5th at p. 671.)

The trial court did not err in finding that L.T. failed to carry his burden of proving that Y.L.'s grabbing his forearm in November 2018 or her text messages in February 2019 were acts of abuse. Y.L. grabbed L.T.'s arm and pushed it away only after trying and failing to dissuade him from advancing on and putting his hands on her. Although the trial court found that L.T. had no intent to "attack" Y.L., the trial court's determination that Y.L. reacted in self-defense to L.T.'s willful touching against her obvious wishes was supported by substantial evidence. (Pen. Code, § 242; Civ. Code, § 50; CALCRIM No. 3470.) Although another reasonable trier of fact might differ from the trial court here as to whether Y.L. used no more force than reasonably necessary to stop L.T. from physically harassing her, we do not substitute our judgment for the trial court's. On this record, we are unable to conclude that the evidence compels a determination that Y.L.'s reaction was disproportionate to L.T.'s unwelcome physical contact. The trial court was entitled to credit Y.L.'s account of the circumstances and to find that her initial verbal efforts at deterrence were plainly ineffectual against L.T.'s intrusiveness.

The trial court's assessment of Y.L.'s February 2019 text messages was likewise adequately supported by Y.L.'s own testimony—which the trial court expressly credited—and by the conditional context of the messages. Although Y.L. referred to "com[ing] at [L.T.'s] throat," the context supports the trial court's nonliteral

13

interpretation as an expression of frustration at L.T.'s manipulative "hints" that he would further disclose Y.L.'s affair to unspecified family members. The text messages themselves include her warnings to L.T. to "back off" rather than "push [her] back against the wall[.]" This interpretation is consistent with Y.L.'s explanation that her threat was to expose uncomfortable facts about L.T. if his conduct were to continue. Nothing in Y.L.'s text messages compels the conclusion that the messages themselves were abusive or that she was the primary aggressor in any prior event.

As for the February 2019 incident in Singapore where Y.L. grabbed the back of L.T.'s neck in trying to force him out of the cab, L.T. observed that the trial court appears to have employed an overly broad conception of self-defense in denying L.T.'s request for a reciprocal restraining order. Although the trial court did not expressly characterize Y.L.'s conduct on this particular occasion as "self-defense," the trial court specifically found that he "[had] not met his burden of showing by a preponderance of the evidence that [Y.L.] has engaged in acts of abuse." Explaining its conception of self-defense at a hearing on its proposed statement of decision, the trial court stated, "There was a method -- a purpose to [Y.L.'s] actions that were consistent with her feeling like she was being victimized in that instance." To the extent that the trial court's statements suggest that Y.L.'s subjective feeling of victimization was sufficient to justify her resorting to physical force to separate L.T. from the cab or Z.T., we are obliged to disagree: the justification of self-defense requires that the actor "reasonably" fear "imminent danger of being touched unlawfully," as opposed to "victimization" more broadly. (See CALCRIM No. 3470.)

Any error in the trial court's conception of self-defense is nonetheless harmless on this record, because L.T. cannot meet his burden of establishing a reasonable probability of a reciprocal restraining order being granted absent the error. (See, e.g., *F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 118.) The trial court in denying L.T.'s request for a restraining order against Y.L. also recited as an independent alternative ground that Y.L.

14

was not on this occasion a primary aggressor, "taking into account both the facts of each particular incident and the patterns of behavior by the parties throughout the relationship."

The trial court found that Y.L. was resorting to physical force "to pull [L.T.] away from [Z.T.] at least in part to stop his behavior."[6]  In view of that finding and the undisputed record evidence that the "behavior" to be stopped was L.T.'s baiting Y.L. via his conversation with the four-year-old Z.T. about living in Singapore and the "bad man" in California, we understand the trial court to have concluded that Y.L.'s action— whether or not legally justified as by reasonable fear of imminent physical harm or unlawful touching—was mitigated by L.T.'s protracted exercise of coercive control, including the immediate indications of his continued willingness to weaponize Z.T. as an instrumentality of that control.  These findings are amply supported by the record and are among the factors the trial court was required to consider under section 6305 and Penal Code section 836, subd. (c)(3).  We conclude that the court acted within its discretion in denying L.T.'s request for a mutual DVRO because there was substantial evidence supporting the court's determination that Y.L. was not a primary aggressor, considering each of the events identified by L.T. in the context of the parties' shared history.  (See *K.L.*, *supra*, 70 Cal.App.5th at p. 979; *Melissa G.*, *supra*, 27 Cal.App.5th at p. 372.)

Even assuming the validity of L.T.'s claim that erroneous notions of self-defense may have informed not only the trial court's determination of abuse but also its primary

---

[6] We reject L.T.'s assertion in his briefing and at oral argument that denial of a restraining order is tantamount to a determination that Y.L. was "entitled" to resort to physical force.  His argument overlooks once again his burden of demonstrating not only an act of abuse but also the necessity of a restraining order under section 6340, and the trial court's duty to weigh Y.L.'s reaction against what the trial court found to be L.T.'s "unrelenting campaign" of coercive control.  The "primary aggressor" inquiry under section 6305 and the "dominant aggressor" inquiry under Penal Code section 836 each presume that both parties have committed an act of abuse.

15

aggressor inquiry, any error in this regard was likewise harmless. On this record, L.T. cannot establish a reasonable probability of a more favorable outcome, absent the error. (See *F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 118.) The trial court's specific findings— L.T.'s years of unremitting and intrusive surveillance of Y.L.; his disparagement of her to the children, prompting her to exit a moving car on the freeway; his actual disclosures of her relationship with S.C. to her parents and his threat of further disclosure; his use of Y.L.'s shame as leverage to secure her sexual submission and child custody concessions—leave us with no reason to doubt that the trial court would find L.T. to fall short in his effort to paint Y.L. as a primary aggressor. It is not reasonably probable that, absent the trial court's overbroad definition of self-defense, L.T. would have obtained a more favorable determination of primary aggression. To the extent L.T. at oral argument for the first time announced that his purpose in appealing the denial of a reciprocal restraining order has been to secure a determination against Y.L. under section 3044, L.T. in this appeal does not challenge any child custody orders, because the trial court issued only interim custody orders pending the parties' full child custody evaluation.[7]

### III.    DISPOSITION

The order denying L.T.'s request for a restraining order is affirmed. Y.L. is awarded her costs on appeal.

---

[7] We accordingly express no opinion as to the application of the presumption in those interim orders. We observe only that a presumption under section 3044—whether reciprocal or not—is rebuttable under the plain terms of the statute, and that the application of section 3044 is not contingent upon a request for or grant of a restraining order under the Act.

_____

LIE, J.


WE CONCUR:


_____

GREENWOOD, P.J.


_____

GROVER, J.


*Y.L. v. L.T.*
H048453