Filed 6/7/24 Certified for Publication 7/3/24 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>D.R.,<br><br>　　　Defendant and Appellant. | E082619<br><br>(Super.Ct.No. J298091-96)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Thomas E. Shinton for Defendant and Appellant.

Tom Bunton, County Counsel, Joseph R. Barrell, Deputy County Counsel for Plaintiff and Respondent.

Defendant and appellant D.R. (mother) challenges jurisdiction and disposition orders as to her six children, all of whom were adjudged dependents of the juvenile court under Welfare and Institutions Code section 300.[1] She argues the dependency petitions were "facially deficient"; some of the sustained jurisdictional allegations lack the support of substantial evidence; and her constitutional rights were violated, both by depriving her of her right to "put on additional evidence" at the continued jurisdiction and disposition hearing for two of the children, and by what she characterizes as a violation of her "due process right to a speedy contested Jurisdictional hearing."

We find some of the juvenile court's jurisdictional findings lack the support of substantial evidence, requiring reversal of the jurisdictional and dispositional orders for four of the children. We otherwise affirm and remand the matter for further proceedings.

## I. BACKGROUND

This appeal involves all six of mother's children: J.M. (born Oct. 2013), S.M. (born Nov. 2015), R.V. (born Aug. 2018), D.V. (born June 2019), G.H. (born May 2020) and B.H. (born April 2022). The children each share a last name with their father, whom we will call father M., father V., and father H. None of the fathers are parties in this appeal.

A. *Father H.*

Mother and father H. married in October 2019, but separated in April 2023. Their separation was triggered by an incident of domestic violence—the first in their

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

relationship, according to mother—where father H. destroyed property in the house ("the whole house was messed up") and he pushed her. Mother called police and father H. was arrested. After the separation, by mutual agreement, mother had sole legal and physical custody of G.H. and B.H., and father H. visited with them. Mother understood that, during visits, father H.'s mother "would be at [father H's] house supervising him with the kids . . . ."

In June 2023, during a visit, father H. was arrested for driving under the influence of alcohol with G.H. and B.H. in the car. This was the most recent in father H.'s long history of criminal offenses, mostly related to driving under the influence, starting in 2011 and including both misdemeanor and felony convictions. The two children were released to mother.

On July 20, 2023, a social worker with plaintiff and respondent San Bernardino County Child and Family Services (the department) met with mother. Mother told the social worker "she would not be allowing [father H.] to transport the children and the current plan is that [the paternal grandmother] will be transporting [G.H. and B.H.]" to visits.

Nevertheless, the very next day, father H. appeared sober to mother, and she "'did not want to keep his children from him,'" so she let him pick up the two children for a visit. He was late dropping the children off, however, and when she called him he sounded intoxicated. Mother and a friend went looking for father H., and spotted him driving near his residence. Mother approached father H.'s car when he stopped at a

3

stoplight and demanded that he return the children, who were both in the back seat. When it seemed to mother that father H. was about to drive off, she "hit him in the face and got the keys out of the ignition, and that's when the cops showed up." Father H. was again arrested for drunk driving, and mother was arrested for domestic violence.

Based on those events, father H. was charged with driving under the influence, his 12th such charge (though some of the charges did not result in convictions). The prosecutor decided not to pursue any charges against mother. Father H., however, expressed to a social worker "concerns regarding [mother's] mental health, and substance abuse," and he showed a social worker "several videos" of her "being verbally aggressive towards him in front of their children."

On July 26, 2023, in family court, father H. requested a domestic violence restraining order against mother. The only domestic violence he alleged is the incident on July 21, 2023, and he omitted from his description of those events that he had been arrested for driving while intoxicated. Our record does not include the family court proceedings. Nevertheless, mother has represented (and the department has not disputed) that father H. failed to appear for an August 17, 2023, hearing to consider a permanent restraining order, so his request was dismissed and the temporary restraining order the court had issued was dissolved.

B. *Father M. and Father V.*

Mother told a social worker father M. had been incarcerated during their relationship for an incident of domestic violence—again, according to mother, the only

4

one during their relationship—and she had full custody of J.M and S.M. Both J.M. and S.M. nevertheless had "consistent contact" with father M. through weekend visits, and both children said they felt "safe" with both parents. Father M. confirmed to the social worker he had been incarcerated for a year and a half for domestic violence against mother, and there was still a restraining order in place against him related to those charges.

Mother told the social worker father V.'s whereabouts were unknown, and he had no contact with D.V. or R.V.

C. *Procedural History*

In August 2023, the department filed dependency petitions alleging that all six children came within section 300, subdivision (b)(1) (failure to protect). As to G.H. and B.H., the department alleged both parents engaged in domestic violence in the children's presence; father H. has a history of alcohol abuse that impaired his ability to care for the children, and mother knew or should have known about that history; and mother has "ongoing mental health problems, which limits her ability to provide adequate care [for the children]."

As to S.M. and J.M, the department similarly alleged mother "has ongoing mental health problems," adding the allegation father M. knew or should have known that mother had "diagnosed mental health [problems]" limiting her ability to adequately care for his children. The department also alleged father M. had engaged in domestic violence

5

in the presence of J.M. and S.M., and father M. knew or should have known mother had "a problem with anger management" that placed the children at risk.

As to D.V. and R.V., the department included similar allegations about mother's "ongoing mental health problems," and that father V. knew or should have known about mother's "diagnosed mental health" problems and "problem with anger management." The department also alleged D.V. and R.V. came within section 300, subdivision (g) (no provision for support), because father V.'s whereabouts were unknown.

Amended petitions for S.M., J.M., D.V., and R.V. added an allegation under subdivision (b)(1) about mother engaging in domestic violence in their presence.

On August 14, 2023, mother, father H., and father M. were present for the detention hearing. The court ordered the children detained, ordered supervised visitation for all the parents, and set the jurisdiction and disposition hearing for September 6, 2023.

The department's jurisdiction/disposition report recommended the allegations of the petitions be sustained except for the section 300, subdivision (g), allegation about father V.; the social worker had contacted him, and he expressed his intention to participate in the dependency proceedings. The department recommended family reunification services for all the parents.

All six children had been placed with their maternal grandmother. The children were "doing exceptionally well"; mother had moved out, and the children were "adjusting to living in their own home" with the maternal grandmother as their caretaker. But the department had not yet completed its interviews, and case plans for the parents

6

were still being designed. On that basis, at the September 6, 2023, initial jurisdiction hearing, the department requested a continuance. Minors' counsel and all three fathers' counsel either joined or expressly submitted to the department's request.

On appeal, mother describes her trial counsel's comments as an "objection" to a continuance, but the record does not support that characterization. Mother's counsel said he did not "mind" if the court set an "interim date" to let the department "get caught up to speed on what it needs to do," and conceded the department's need for more time to complete its work could be good cause for a continuance. Mother's counsel emphasized, however, that he "want[ed] this hearing ASAP," and he "would like to set a firm date" for a contested hearing because "it's not up to [mother] just to wait around for the government to get their case complete." Mother's counsel estimated that the testimony he intended to present would "take at least a day to get through," so he requested not only one date be set but also a "backup," so that the matter does not "keep getting delayed." The court set contested jurisdiction and disposition hearings for October 12 and October 30, 2023.

On October 11, 2023, the department filed an addendum report describing its interviews with the parents, and recommending case plans for each of them. Mother told the social worker she had been diagnosed with anxiety and depression three years ago, and had "tried taking psychotropic medication," but it "did not work for her." In later testimony, mother specified this was postpartum depression and anxiety, and that although medication did not help, her symptoms "just went away" and she "felt better"

7

within a short period of time. She said she "follow[ed] up" and was told "'Okay. It sounds like you're doing good.'"

Mother acknowledged to the social worker she hit father H. during the July 21, 2023 incident, and explained she did so to try to get the children away from him because he was driving while intoxicated. She said she knows father H. is an alcoholic, and she called allowing him to continue to have contact with their children a "huge mistake." She ended her relationship with father H. in January 2023, and he left the house in April 2023. They remained legally married, but he had filed for divorce. She divorced father M. in 2016, and said she was a victim of domestic violence during that relationship. She "denied having any history of domestic violence" with father V., who she said had no contact with his children for at least three years. Mother denied having any anger management problems.

Father H. told the social worker he had "a history of domestic violence" with mother, but that she was the perpetrator. He denied being an alcoholic, saying he last used alcohol at the beginning of August 2023, and that he had been sober in 2019 when he and mother started their relationship. He started drinking again "due to mother's lack of love towards him." Father H. described mother as "Bi-polar," "very violent," and "verbally abusive to him," including in front of their children. He said the children would run out of the room when mother was "'being evil,'" as G.H. would call it.

Father M. admitted to the social worker that he was the perpetrator of domestic violence against mother. He said he was working full time and enrolled in a trade school,

8

but currently homeless due to child support payments to mother. Before the dependency, he saw his children every other weekend. The social worker described father M. as having "a very negative attitude during the interview," including by referring to mother as "'crazy'" and "the one that got him 'locked up.'"

Father V. told the social worker he had had no contact with his children since 2019 because mother "made it very difficult for him to see" them. He expressed regret that he had not followed up in family court. He said he "understands" mother "has moved on with her life, however, he would like custody of his children," and he would complete "whatever services are required by the Court."

At the hearing on October 12, 2023, mother's counsel submitted a motion to strike, arguing father H.'s statements about mother's mental health, described in the department's addendum report, should be stricken. Mother also submitted a request for a restraining order protecting mother, G.H., and B.H. from father H.[2] In her supporting declaration, mother alleged a "major catalyst" for father H. moving out in April 2023 was the "domestic violence incident where he pushed mother and destroyed some property" at their house. She also cited father H. placing the children at risk by driving with them while intoxicated, and derogatory text messages he sent her in August and October 2023.

---

[2] Mother only submitted a form JV-245 Request for Juvenile Restraining order. She did not initially include the required form JV-250 Notice of Court Hearing and Temporary Restraining Order; she submitted that form, together with a supplementary declaration regarding new "harassing and threatening messages" from father H., on October 17, 2023. (See Cal. Rules of Court, rules 5.620(b), 5.630(c)(3).) The court granted a temporary restraining order on October 17, 2023, and set a hearing to review the request for October 30, 2023.

The juvenile court lodged the motion to strike and request for a restraining order, but reserved ruling on them. The social worker who authored the initial and addendum jurisdiction and disposition reports testified.

At the continued hearing on October 30, 2023, the court heard testimony from a second social worker—the one who authored the detention report—and from mother. Mother's counsel ran out of time, however, to complete his direct examination of mother, particularly with respect to matters relating to her request for a restraining order against father H. The juvenile court confirmed with mother's counsel that the remaining testimony would not relate to father V. Having done so, at the request of the department, the court ordered R.V. and D.V. to have an extended, 29-day visit with father V., and continued the "in-progress" jurisdiction and disposition hearing as to them until December 18, 2023. It set November 2, 2023, as the date to continue the "in-progress hearing" as to the other four children.

On November 2, 2023, mother's testimony was completed, and there were no further witnesses. The juvenile court overruled mother's evidentiary objections to statements by father H. described in the department's reports. The parties agreed to a stipulation to how mother would testify about her current progress in services, and her intentions to pursue a permanent restraining order against father H.[3] The parties'

---

[3] The juvenile court in fact issued a permanent restraining order against father H. on November 20, 2023.

10

arguments on jurisdiction and disposition were started on November 2, 2023, and completed on November 7, 2023.

The juvenile court found father H.'s and father M.'s children came within section 300, subdivision (b)(1). It found the allegations against father H. to be true. The court found true that mother knew or should have known father H. had a history alcohol abuse that impaired his ability to care for B.H. and G.H. The court found "no evidence" mother currently had any mental health problem, but amended the allegations about her mental health to reflect instead "a history" of mental health issues, and found the related allegations as to all four children true as amended. It similarly amended the domestic violence allegations against mother as to G.H. and B.H., finding true that she "has a history" of engaging in domestic violence. The court specified that it did not view mother's act of punching father H. on July 21, 2023, when he was driving intoxicated with G.H. and B.H. in the car, as an act of domestic violence. The court found true as pleaded the domestic violence allegations in J.M.'s and S.M.'s petitions. At the department's request, the court dismissed the allegation that father M. knew or should have known mother had a problem with anger management. The court ordered family reunification services for mother, father H., and father M.

In December 2023, the department reported there were "no current concerns for substance use or abuse" by father V. His extended visits with R.V. and D.V. were going "exceptionally well"; the children appeared to be "bonded to their father" and "thriving in his care," with "no problems or concerns . . . reported." The department recommended

11

the jurisdictional allegations against father V. be dismissed, and the allegations against mother be found true as amended to reflect "a history of" mental health problems and domestic violence. For disposition, the department recommended R.V.'s and D.V.'s dependency cases be dismissed with orders granting sole physical custody to father V., joint legal custody for mother and father V., and weekly supervised visitation for mother. Mother's counsel objected to the juvenile court "refusing to allow [mother] to continue her testimony." Counsel said mother was prepared to testify father V. failed to provide child support or try to obtain custody or visitation with the children for the previous four years. Counsel also made an offer of proof that mother had completed her services, including 16 hours of domestic violence classes, and that she would testify "to how she has benefitted from her classes, how she's learned from these classes, that the children are safe in her care, that she has been their primary parent their entire life, that there is no risk of harm or concern with the children in her care." Counsel also argued that the hearing was "well more than 120 days after the initial detention," and the "proper remedy" was "dismissal."

After hearing arguments from the parties, the court issued orders following the department's recommendations and terminating dependency jurisdiction over R.V. and D.V.

## II. DISCUSSION

Before turning to mother's evidentiary arguments, we first briefly address her argument the dependency petitions are "facially deficient." She concedes "some case

12

law" holds any insufficiency in the dependency allegations is "waived if not raised."

This is an understatement. There are a few cases holding an appellant may raise for the

first time on appeal a challenge to the facial sufficiency of dependency petition

allegations. (E.g., *In re Alysha S.* (1996) 51 Cal.App.4th 393, 396-397 (*Alysha S.*); *In re*

*Nicholas B.* (2001) 88 Cal.App.4th 1126 [following *Alysha S.* without substantial

analysis].) Most appellate authority considering the issue, however, particularly in the

last 20 years, has rejected that approach. (See *In re David H.* (2008) 165 Cal.App.4th

1626, 1637-1640 [discussing history of "split in authority," siding with cases finding

waiver, and "updating" the reasoning supporting that conclusion].)

We, too, are unpersuaded by *Alysha S.* and similar cases. "[B]y its own terms,"

the Code of Civil Procedure provision *Alysha S.* applies, section 430.80, "does not apply

to dependency proceedings."[4] (*In re David H.*, *supra*, 165 Cal.App.4th at p. 1640.)

Moreover, "the statute is inconsistent with the purposes of juvenile dependency law."

(*Ibid.*) "Allowing parties to challenge the facial sufficiency of a [dependency] petition

for the first time on appeal conflicts with the emphasis on expeditious processing of these

cases so that children can achieve permanence and stability without unnecessary delay if

reunification efforts fail." (*Ibid.*) "Enforcing the forfeiture rule requires parties to raise

---

[4] Code of Civil Procedure section 430.80 governs waiver by failure to object by demurrer or answer to pleadings in civil actions, and applies to a "party against whom a complaint or cross-complaint has been filed" and a "party against whom an answer has been filed." It is not among the Code of Civil Procedure sections expressly incorporated into the Welfare and Institutions Code. (See § 348; *In re David H.*, *supra*, 165 Cal.App.4th at p. 1640.)

such issues in the juvenile court where they can be promptly remedied," for example, by amending the petition to conform to proof. (*Ibid.*) We therefore do not agree with mother that we should address her forfeited facial challenges to the petitions. We turn to her evidentiary arguments.

The juvenile court has jurisdiction over a child if the department establishes by a preponderance of the evidence that allegations made under section 300 are true. (§ 355; *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 118-119.) Section 300, subdivision (b)(1) applies when """"[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the minor."""" (*In re T.V.* (2013) 217 Cal.App.4th 126, 132.) Jurisdiction findings under section 300 require evidence the child is subject to a defined risk of harm at the time of the hearing. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 132.) We review the juvenile court's jurisdictional findings for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

In dependency matters, as a general rule, """"[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate."""" (*In re D.P.* (2023) 14 Cal.5th 266, 283; accord *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence," without considering the adequacy of the evidence in support of "other alleged statutory grounds for jurisdiction"].) Additionally, "[b]ecause

the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) In other words, once it is determined that jurisdiction was properly assumed based on one parent's conduct, "we need not consider jurisdictional findings based on the other parent's conduct." (*Ibid.*; accord *In re D.P.*, at pp. 283-284.)

Here, the jurisdictional findings as to G.H. and B.H. that father H. "has a history of alcohol use which impairs his ability to adequately take care of [them]" are unassailable. Within about a month, father H. was arrested twice for driving under the influence of alcohol with G.H. and B.H. in the car. This is ample evidence of his failure or inability to protect the children from a substantial risk of physical harm under section 300, subdivision (b)(1). In arguments below, mother properly conceded the juvenile court had jurisdiction over G.H. and B.H. on that basis, and she has not argued otherwise on appeal.

Mother contests the sufficiency of the evidence supporting the finding she knew or should have known about father H.'s history of alcohol use, and failed to protect their children adequately. We disagree with her assessment. Perhaps she did not know the full extent of father H.'s criminal history related to drunk driving. Nevertheless, she admitted knowing of a 2020 arrest for drunk driving and the recent arrest in June 2023. She spoke with a social worker on July 20, 2023, and agreed that the children should not drive with father due to concern about his drinking and driving. Nevertheless, the next day, she allowed father H. to transport the children for a visit. While she tried to retrieve the

15

children from him once she realized he was again driving while intoxicated with them in the car, that does not negate that earlier failure. There is ample basis for the juvenile court's jurisdictional finding against her.

Thus, the juvenile court properly assumed dependency jurisdiction over G.H. and B.H. based on allegations against both mother and father H. A different analysis is required, however, for the other four children. They were not in the car when father H. was arrested for driving under the influence, and their dependency petitions include no allegations relating to his use of alcohol while they lived with him and mother.

The department argues mother is not "aggrieved" by the juvenile court's decision to sustain jurisdictional allegations against father M., so she lacks standing to challenge them. In the department's view, because father M. did not appeal, the jurisdictional allegations sustained against him are unassailable, and accordingly the juvenile court's exercise of dependency jurisdiction over J.M. and S.M. must be affirmed.

We disagree. Generally, a parent is precluded from raising issues that do not affect his or her own rights. (*In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1193.) Nevertheless, "'[w]here the interests of two parties interweave, either party has standing to litigate issues that have a[n] impact upon the related interests. This is a matter of first party standing.'" (*Ibid.*) The juvenile court's exercise of jurisdiction over mother's children, even if based solely on allegations against father M., abridges her own parental rights. (§ 362, subd. (a); *In re Carmen M.* (2006) 141 Cal.App.4th 478, 486.) Mother

16

therefore has standing to challenge the sufficiency of the evidence supporting the jurisdictional findings against father M., as well as those against her.

For similar reasons, mother has standing to challenge the jurisdictional allegations sustained against her as to R.V. and D.V. "[W]hen a juvenile court's finding forms the basis for an order that continues to impact a parent's rights—for instance, by restricting visitation or custody—that jurisdictional finding remains subject to challenge, even if the juvenile court has terminated its jurisdiction." (*In re D.P.*, *supra*, 14 Cal.5th at pp. 276-277.) That is exactly what has happened here. The juvenile court removed R.V. and D.V. from mother's custody, granted full physical custody to father V., and restricted mother to weekly supervised visitation. Reversal of jurisdictional findings against mother would "call[] into question the validity" of those orders, so review "can grant [mother] effective relief." (*In re D.P.*, at p. 277.) Even though the dependency petitions for R.V. and D.V. have been dismissed, there is nothing moot about mother's challenge to the jurisdictional findings.[5]

We will start with the juvenile court's finding that father M. had engaged in domestic violence in the presence of S.M. and J.M. Past incidents of domestic violence alone, while a predictor of future violence (*In re R.C.* (2012) 210 Cal.App.4th 930, 942),

---

[5] To the extent a different conclusion is possible on this record, we would nevertheless exercise our discretion to consider the matter on the merits. (See *In re D.P.* 14 Cal.5th at p. 282; see also *In re Andrew S.* (2016) 2 Cal.App.5th 536, 542, fn. 2 ["'When, as here, the outcome of the appeal could be "the difference between [a parent] being an 'offending' parent versus a 'non-offending' parent," a finding that could result in far-reaching consequences with respect to these and future dependency proceedings, we find it appropriate to exercise our discretion to consider the appeal on the merits'"].)

cannot support a jurisdiction finding based on domestic violence: "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue . . . ." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, overruled in part on other grounds by *In re D.P.*, *supra*, 14 Cal.5th at p. 278.)

In *In re Daisy H.*, for example, the acts of domestic violence occurred at least two, and probably seven, years before the petition was filed, there was no evidence the children were exposed to that violence, and there was no evidence of any ongoing violence between the parents, who were separated. (*In re Daisy H.*, *supra*, 14 Cal.4th at p. 717.) The court of appeal concluded this "evidence was insufficient to support a finding that past or present domestic violence between the parents placed the children at a current substantial risk of physical harm." (*Ibid.*; see also *In re Jesus M.* (2015) 235 Cal.App.4th 104, 113 [no substantial evidence to support domestic violence jurisdiction finding where "the parents had long been separated, the two incidents [the mother] could recall had occurred more than three years earlier, and there was no evidence of current violent behavior"].)

Here, there is evidence of only a single incident of domestic violence by father M. against mother, the one resulting in his 2015 conviction for spousal battery. According to mother, that offense was the only incident of domestic violence between them during their relationship, and it was committed outside the presence of the children. There is no contrary evidence. Moreover, father M. and mother's marriage ended in 2016. In the

years since then, so far as can be determined from the record, they have coexisted without incident, despite interacting to the limited extent necessary for father M. to visit with their children. And their children both expressed that they feel safe with both of their parents. Thus, there is simply no evidence of any ongoing domestic violence between father M. and mother, nor is there evidence showing a likelihood past violence will recur. The juvenile court's jurisdictional findings that the children come within section 300, subdivision (b)(1), based on father M. engaging in domestic violence therefore lack the support of substantial evidence.

Of course, the allegation against mother that she has a history of engaging in domestic violence is not limited to domestic violence between her and father M. Evidence of domestic violence between her and father H. could also support dependency jurisdiction over any of the six children living with them.

Nevertheless, record evidence of *mother* perpetrating domestic violence, or failing to protect the children from domestic violence perpetrated by another, is sparse. Speaking to a social worker, father H. accused her of being a perpetrator of domestic violence in conclusory terms, describing her as "very violent." In his application for a restraining order, however, the only incident of domestic violence he identified was when she hit him on July 21, 2023, as she tried to get the car keys from him while he was driving drunk with the children in the back seat. The juvenile court declined to treat that blow as an act of domestic violence, implying it found mother permissibly used reasonable force in defense of her children against a substantial risk of physical harm.

19

(See, e.g., *J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 976.) The department has not argued we should treat it differently in our analysis.

The department cites as "evidence" of mother engaging in domestic violence "several videos of Mother being verbally aggressive towards Father H. in front of the children viewed by" one of the social workers. Importantly, however, that characterization of those videos is the only evidence of them; the videos themselves were not introduced into evidence. And in her testimony, the social worker added no more details about what she meant in describing mother's behavior as depicted in the videos as "verbally aggressive." From this record, there is no nonspeculative basis to determine whether mother's behavior in the videos crossed the line from rude or profane to demonstrating a substantial risk of *physical* harm or illness to the children, as is required to support a jurisdictional finding under section 300, subdivision (b)(1).[6]

We find no merit in the department's suggestion that the restraining order issued to protect mother, B.H., and G.H. on November 20, 2023, is "indicative of a current domestic violence relationship" between mother and father H. "at the time of the hearings." Abusive text messages from a *former* partner are, of course, an appropriate basis for someone to seek and obtain a domestic violence restraining order, as mother did

---

[6] We note the department did not allege any of the children came within section 300, subdivision (c), which applies when a child is suffering or at substantial risk of suffering serious *emotional* damage. Such an allegation might tend to fit more easily with evidence of abusive behavior that is only verbal, and not physical. But it would be difficult to square with the social worker's observation that the children seemed "happy and healthy."

here. (See, e.g., § 213.5, subd. (a); Fam. Code, §§ 6211, subds. (a) & (b), 6300, 6301, subd. (b), 6320, subd. (c).) Such a restraining order is not evidence of a current relationship between victim and perpetrator, let alone one that could pose a risk of harm to their child. If anything, it is evidence of protective action taken by the victim, tending to weigh *against* a finding that parent was failing to protect the child from a substantial risk of harm.

We are left, then, with evidence of mother's involvement in two incidents of physical domestic violence, both times as the victim. Once, father M. was violent towards her, after she had moved out and was ending their relationship. She involved the police, he was arrested and criminally convicted, they divorced, and there was no more violence between them. On the other occasion, after her relationship with father H. had ended but while they were still living together, he became violent, trashing the house and pushing her. Mother moved out of the house temporarily, until father H. moved out, she involved the police and he was arrested, divorce proceedings were initiated (albeit by him), and there was no more violence between them.

We see nothing in these facts tending to show mother "would nonaccidentally expose the children" to domestic violence, or that she "would fail to protect the children" from her partners' foreseeable violent conduct. (*In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119-120.) On the contrary, they show mother responding with appropriate and effective action to protect both herself and the children in response to

21

unforeseeable violence by two partners. That is not an adequate basis for dependency jurisdiction.

We disagree with the department's suggestion that *In re S.O.* (2002) 103 Cal.App.4th 453 is "instructive" here. In *In re S.O.*, at issue was a jurisdictional finding about domestic abuse as to the mother's youngest child, who was born while dependency proceedings for his older siblings were ongoing. (*Id.* at p. 460.) Those proceedings had been triggered by domestic violence against mother and sexual abuse of one of the older siblings by the father. (*Id.* at p. 456.) The mother testified that she was "unsure whether she planned to reunite" with the father. (*Id.* at p. 462.) The mother also repeatedly violated court orders by allowing the father unsupervised contact with the children. (*Id.*, at p. 462.) And the mother admitted she had no plan for arranging supervised visits without the county welfare department's assistance, "and indeed expected that Agency personnel would supervise the visits." (*Ibid.*) On those facts, the court of appeal deferred to the juvenile court's jurisdictional finding of a substantial risk the child would suffer serious physical harm due to the mother's failure or inability to protect him adequately. (*Ibid.*)

Our different facts require a different conclusion. There is no evidence of mother vacillating about reuniting with father H.; they had been "on-and-off" during their marriage because of various "disagreements," but nothing in evidence shows the relationship was anything but "off" after he pushed her in April 2023 and he was arrested for domestic violence. In June and July 2023, there was no court order forbidding father

22

H. contact with the children, and mother's understanding was that the visits she allowed him to have would be supervised by his mother. Mother also had already coparented with father M. for years without any recurrence of violence between them. On these facts, we find no substantial evidence supporting a conclusion that mother had or was likely in the future to fail to protect the children against exposure to domestic violence.

There is also a dearth of evidence in support of the finding father M. knew or should have known mother has a history of diagnosed mental health conditions that limit her ability to adequately care for his children. Mother told a social worker in August 2023 that she had been diagnosed about three years earlier with depression and anxiety. Mother and father M. divorced years before that diagnosis, in 2016. There is nothing in the record showing father M. knew or should have known of any diagnoses mother may have received after 2016. To be sure, he told a social worker mother was "crazy." But that colloquial, non-expert evaluation does not demonstrate awareness that mother ever had a diagnosed mental health issue, nor is it evidence father M. should have known of such a diagnosis.[7]

---

[7] Father H. calling mother "Bi-polar," or paraphrased statements in department reports from unidentified "family members" about mother having "mental health" problems, are similarly weak evidence, insufficient on their own to establish that mother suffers or suffered from diagnosed or diagnosable mental illness, or that father M. knew or should have known about any mental health issues mother may have had. That is particularly so in this case, because the social worker testified at the jurisdiction stage she could not recall if her reference to "family members" reporting mother to have mental health issues included anyone other than father H. and father M.

Nor is there any evidence that any mental health conditions mother might have, diagnosed or not, limited her ability to care for the children adequately. "The law is settled that harm may not be presumed from the mere fact of a parent's mental illness." (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1049-1050.) There must be some connection between the parent's mental health issues and the physical harm or risk of physical harm to the child. (See *ibid.*; *In re David M.* (2005) 134 Cal.App.4th 822, 830, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.) The trial court found no evidence that mother currently suffered from any mental illness, let alone an illness that currently limited her ability to care for the children adequately. We agree with that assessment. The social worker observed the family home to be "clean and free of clutter with working utilities," and in speaking with J.M. and S.M., both "appeared to be happy and healthy," free from abuse or neglect, and felt "safe with [their] mom." There is also no evidence tending to show any past mental health issues were likely to recur, or that *in the past* they limited her ability to care for the children to the point that they were at risk of physical harm. The juvenile court therefore erred by sustaining, even as amended, the jurisdictional allegations about mother's mental health.

In sum, none of the jurisdictional findings sustained against father M. or mother as to J.M. and S.M. withstand substantial evidence review. There is no evidence mother has a history of mental health problems limiting her ability to adequately care and supervise the children, let alone that father M. knew or should have known about such problems. There is no evidence of any *current* substantial risk of mother engaging in domestic

24

violence with father M. or father H., or of mother failing to protect the children from domestic violence by either man. The similar findings against mother as to R.V. and D.V. also lack the support of substantial evidence, for the same reasons.

The same reasoning also means the jurisdictional findings as to G.H. and B.H. related to mother's mental health and mother engaging in domestic violence also lack the support of substantial evidence. As discussed, however, the juvenile court properly took jurisdiction over them based on other sustained allegations that were supported by evidence.

The lack of substantial evidence to support of any of the juvenile court's jurisdictional findings as to J.M., S.M., R.V., and D.V. requires reversal not only of the order adjudging them dependents, but also subsequent dispositional orders. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 565; *In re Isabella F.* (2014) 226 Cal.App.4th 128, 141.) That, in turn, moots mother's argument that she was erroneously denied the opportunity to present additional evidence at the disposition hearing for D.V. and R.V.

Because we do not disturb the order adjudging G.H. and B.H. to be dependent children, we briefly address mother's argument her "due process right to a speedy contested Jurisdictional hearing" was violated. "'It is axiomatic that due process guarantees apply to dependency proceedings.'" (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1006.) We assume that there is some degree of delay that, combined with a lack of good cause for it, would violate a parent's due process rights. Nevertheless, nothing in the record supports the notion that these children's cases were not heard in a reasonably

25

expeditious manner, in accordance with the relevant statutes and mostly in accordance with mother's own scheduling requests.  She has not demonstrated any violation of her due process rights.

## III. DISPOSITION

The juvenile court's true findings on jurisdictional allegations as to G.H. and B.H. regarding mother having a history of mental health problems and a history of engaging in domestic violence are reversed; in all other respects, the jurisdictional and dispositional findings and orders as to G.H. and B.H. are affirmed.  The court's jurisdictional and dispositional findings and orders as to J.M., S.M., R.V., and D.V. are reversed.  The matter is remanded to the juvenile court for further proceedings consistent with this opinion and applicable law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL                        
J.

We concur:

McKINSTER            
            Acting P. J.

MENETREZ            
            J.

26

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re B.H. et al., Persons Coming Under the Juvenile Court Law. | |
| | E082619 |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | (Super.Ct.No. J298091-96) |
| Plaintiff and Respondent, | |
| v. | |
| D.R., | |
| Defendant and Appellant. | |

Requests having been made to this court pursuant to California Rules of Court, rule 8.1120(a) for publication of a nonpublished opinion heretofore filed in the above-entitled matter on June 27, 2024 and June 28, 2024, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b).  The opinion filed in this matter on June 7, 2024, is certified for publication.

CERTIFIED FOR PUBLICATION

RAPHAEL
                                                                                          J.

We concur:

McKINSTER
          Acting P. J.

MENETREZ
                    J.

1